## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

### MOTION INFORMATION STATEMENT

Docket Number(s): new case, 3:01-cv-01552-SRU D.Conn                    Caption [use short title]

Motion for: Permission to Appeal Pursuant to Rule 23(f)     Haddock, et al v. Nationwide Life Insurance Co.

Set forth below precise, complete statement of relief sought:

Defendant-Petitioner seeks permission to appeal

an order of the U.S. District Court for the District of

Connecticut certifying Plaintiffs' ERISA claims as a

class action under Fed. R. Civ. P. 23(b)(3).

MOVING PARTY: Nationwide Life Insurance Co.           OPPOSING PARTY: Lou Haddock, et al.

☐ Plaintiff  ☑ Defendant
☑ Appellant/Petitioner  ☐ Appellee/Respondent

MOVING ATTORNEY: Noah A. Levine           OPPOSING ATTORNEY: Richard A. Bieder

[name of attorney, with firm, address, phone number and e-mail]

Wilmer Cutler Pickering Hale & Dorr LLP           Koskoff, Koskoff & Bieder, P.C.
7 World Trade Center, 250 Greenwich St.           350 Fairfield Ave., 5th Floor
New York, NY 10007                                 Bridgeport, CT 06604
212-230-8800; noah.levine@wilmerhale.com           203-336-4421; rbieder@koskoff.com

Court-Judge/Agency appealed from: Hon. Stefan R. Underhill, United States District Court for the District of Connecticut

Please check appropriate boxes:                    FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND
                                                   INJUNCTIONS PENDING APPEAL:

Has movant notified opposing counsel (required by Local Rule 27.1):   Has request for relief been made below?         ☐ Yes  ☐ No
☐ Yes ☑ No (explain): Rule 23(f) Petition for       Has this relief been previously sought in this Court?   ☐ Yes  ☐ No
Permission to Appeal                                Requested return date and explanation of emergency: _____

Opposing counsel's position on motion:
☐ Unopposed  ☐ Opposed  ☑ Don't Know
Does opposing counsel intend to file a response:
☐ Yes ☐ No ☑ Don't Know

Is oral argument on motion requested?  ☑ Yes  ☐ No  (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?  ☐ Yes ☑ No  If yes, enter date: _____

Signature of Moving Attorney:
_Noah A. L._ Date: 09/20/2013           Service by: ☐ CM/ECF  ☑ Other [Attach proof of service]

## ORDER

IT IS HEREBY ORDERED THAT the motion is **GRANTED  DENIED**.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, Clerk of Court

Date: _____     By: _____

Form T-1080 (rev. 7-12)

# 13-_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

LOU HADDOCK, as trustee of the Flyte Tool & Die Company Inc.
401(k) Profit-Sharing Plan, et al.,

*Plaintiffs-Respondents,*

v.

NATIONWIDE LIFE INSURANCE CO.,

*Defendant-Petitioner.*

## PETITION OF DEFENDANT-PETITIONER FOR PERMISSION TO APPEAL PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(f)

From an Order Granting Certification of a Class Action, Entered on September 6, 2013, by the United States District Court for the District of Connecticut, 3:01-CV-01552 (SRU), The Honorable Stefan R. Underhill

CHARLES C. PLATT
NOAH A. LEVINE
WILMER CUTLER PICKERING
    HALE AND DORR LLP
399 Park Avenue
New York, NY 10022
(212) 230-8800

THOMAS F. CLAUSS, JR.
WIGGIN AND DANA LLP
Two Stamford Plaza
281 Tresser Boulevard
Stamford, CT 06901
(203) 363-7610

DAVID W. BOWKER
DANIEL P. KEARNEY, JR.
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

*Attorneys for Defendant-Petitioner*

## RULE 26.1 DISCLOSURE STATEMENT

Defendant-Petitioner Nationwide Life Insurance Company is a wholly-owned subsidiary of Nationwide Financial Services, Inc., which in turn is a wholly owned subsidiary of Nationwide Corporation, which in turn is a subsidiary of Nationwide Mutual Insurance Company, a company that has no parent corporation and in which no publicly held corporation currently owns 10% or more of the common stock.

# TABLE OF CONTENTS

Page

RULE 26.1 DISCLOSURE STATEMENT ............................................................................i

TABLE OF AUTHORITIES ....................................................................... iii

QUESTIONS PRESENTED .................................................................1

INTRODUCTION ............................................................................1

STATEMENT OF THE CASE ..............................................................5

STANDARD FOR GRANTING REVIEW ...........................................10

REASONS FOR GRANTING THE PETITION ....................................11

I.     CLASS CERTIFICATION WAS ERRONEOUS .......................................11

       A.     The District Court Failed To Identify Any Common
              Classwide Evidence That Actually Supports The Only
              Theories It Approved............................................................11

       B.     The District Court Erroneously Treated Individual
              Liability Issues As Individualized Damages And
              Monetary Relief Issues That Could Be Deferred For
              Later Plan-By-Plan Proceedings .......................................16

II.    THERE IS A COMPELLING NEED TO ADDRESS THE QUESTION
       PRESENTED ..........................................................................19

CONCLUSION ..............................................................................20

CERTIFICATE OF SERVICE

CERTIFICATE OF ELECTRONIC FILING

ADDENDUM

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Authors Guild, Inc. v. Google Inc.*, 721 F.3d 132 (2d Cir. 2013)............................16

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) .........................................*passim*

*F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250 (2d Cir. 1987) ......................................................................................14

*Haddock v. Nationwide Financial Services, Inc.*, 262 F.R.D. 97 (D. Conn. 2009) ......................................................................*passim*

*Haddock v. Nationwide Financial Services, Inc.*, 419 F. Supp. 2d 156 (D. Conn. 2006) ............................................................................7

*Healthcare Strategies, Inc. v. ING Life Ins. & Annuity Co.*, No. 11-282, Doc. No. 102 (D. Conn. Sept. 27, 2012) ..........................................20

*Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009) ..............................................8

*Hevesi v. Citigroup Inc.*, 366 F.3d 70 (2d Cir. 2004) ..............................................11

*In re Initial Public Offerings Securities Litigation*, 471 F.3d 24 (2d Cir. 2006)............................................................................19

*In re Sumitomo Copper Litigation*, 262 F.3d 134 (2d Cir. 2001)......................11, 20

*Leimkuehler v. American United Life Insurance Co.*, 713 F.3d 905 (7th Cir. 2013) ................................................................6, 8, 12, 14, 15, 20

*McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) ......................16

*McManus & Pellouchoud, Inc. Employees' Profit Sharing Trust v. L.F. Rothschild, Unterberg, Towbin*, 1989 WL 100103 (N.D. Ill. Aug. 23, 1989)..........................................................................17

*Nationwide Life Insurance Co. v. Haddock*, 460 F. App'x 26 (2d Cir. 2012) ......................................................................................9, 10

*Pegram v. Herdrich*, 530 U.S. 211 (2000)................................................................8

*Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc.*, 601 F.3d 1159 (11th Cir. 2010) ...............................................18

*Santomenno v. John Hancock Life Insurance Co.*, 2013 WL 3864395 (D.N.J. July 24, 2013)..................................................................................20

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ..................................4, 9, 19

## STATUTES AND RULES

29 U.S.C. §1002(21)(A)(i)...........................................................................8, 14, 15

Employee Retirement Income Security Act of 1974,
29 U.S.C. §§ 1101 *et seq.* ............................................................................1
29 U.S.C. § 1102...........................................................................................5
29 U.S.C. § 1104.......................................................................................7, 17
29 U.S.C. § 1106...........................................................................................7

Fed. R. Civ. P. 23 .................................................................................*passim*

Nationwide Life Insurance Company ("Nationwide") petitions under Federal Rule of Civil Procedure 23(f) for permission to appeal the district court's September 6, 2013 order certifying a class action under Rule 23(b)(3). This petition is filed within fourteen days of entry of that order.

## QUESTIONS PRESENTED

1.    Whether, under *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), the district court erred by certifying a Rule 23(b)(3) class based on purported classwide evidence that bears no link to the only legal theories that the district court held to be viable.

2.    Whether the district court erred by treating Nationwide's substantial and individualized *liability* defenses as "individualized *damages* issues" and "*monetary relief*" issues that could be addressed through "management tools" like bifurcation, referral to a special master, or decertification after a liability finding.

## INTRODUCTION

The district court certified a significant class action—covering every ERISA[1] plan to which Nationwide provided variable annuity products during an 18-year period—without ever finding that Nationwide's liability could actually be determined based on common, classwide evidence.

---

[1] Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1101 *et seq.*

1.  Plaintiffs are trustees of the ERISA plans (the "Plans").  Nationwide provided annuity products that included standard menus of mutual fund investment options that the trustees and Plan participants could select.  Since this case commenced in 2001, Plaintiffs have advanced several theories of Nationwide's ERISA fiduciary liability.  The district court found only two to be "viable."  A19. The first is the theory that Nationwide allegedly "'leveraged'" the Plans' assets to "'extract'" payments (often referred to as "revenue sharing") from the mutual funds on the annuities' product menus.  A17.  The second is the theory that Nationwide allegedly used its ability to select, remove, and replace mutual funds on the product menus to obtain revenue sharing payments.

The district court certified a Rule 23(b)(3) class action without finding that any classwide, common evidence could actually support Plaintiffs' case under either theory.  The *only* classwide, common evidence referred to in the court's order is "'the structural nature of Nationwide's contractual relationship with the Plans'"— *i.e.*, the "uniform investment process … evidenced by the standardized terms contained in the annuity contracts that governed Nationwide's relationship with the Plans and participants."  A18, A21.  In other words, the district court found that a Rule 23(b)(3) class proceeding is appropriate because Plaintiffs' case purportedly can be proved through Nationwide's annuity contracts alone.

The court's reasoning is fatally flawed because there is a complete disconnect between the only legal theories the court held to be "viable" (A19) and the purported classwide evidence. *See Comcast*, 133 S. Ct. at 1433. The terms of Nationwide's contracts with each Plan do not and cannot prove that Nationwide "leveraged" the Plan's assets in its dealings with mutual funds, so as to "extract" revenue-sharing payments from those mutual funds. Nor can those contract terms prove that Nationwide ever in fact "exercised" any control over the disposition of a Plan's assets by selecting mutual funds to include in Nationwide annuity products. The certification order here is thus based on the same fatal fiction that doomed class certification in *Comcast*. Evidence that is logically irrelevant to, and insufficient to prove, the only purportedly "viable" legal theories in the case cannot prove predominance under Rule 23(b)(3).

2. The district court also certified a Rule 23(b)(3) class without any finding that classwide, common evidence could support Plaintiffs' case as to two key Nationwide defenses. Even if Nationwide were treated as an ERISA fiduciary, there could be no breach of fiduciary duty as to the many Plans that (a) were informed of revenue sharing and expressly endorsed contract amendments or took other actions to consent to, or ratify, the practice, or (b) received complete "pass-through" of the mutual fund revenue sharing through either lower prices on the

corresponding mutual fund investment options or services rendered by Nationwide. Both issues go to Nationwide's *liability* for an ERISA breach.

The district court conveniently but erroneously dismissed the individualized nature of both issues by characterizing them as "individualized damages issues" or "monetary relief" issues that could be addressed through "management tools" like "bifurcation, the use of a magistrate or special master, … *or even decertification after a finding of liability*." A24 (emphasis added, internal quotation marks omitted). This was a fundamental error. Ratification and pass-through *are* individualized *liability* issues that will predominate at any trial. The district court decision lacks *any finding* that these liability issues can be litigated on a common, classwide basis.

This is not the first time this Court has been called upon to review class certification in this case. Serious questions about the district court's first class-certification order, which the court had granted under Rule 23(b)(2), led this Court to grant an earlier Rule 23(f) appeal. This Court decided that appeal under the intervening Supreme Court decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), which rendered the district court's certification under Rule 23(b)(2) improper. The district court's reinstated class certification—this time under Rule 23(b)(3)—is also seriously flawed and warrants intervention by this Court.

4

## STATEMENT OF THE CASE

1.      Nationwide provided annuity products to each of the Plans at some time during the nearly 18-year class period.  A3.  Plaintiffs are the trustees, the named ERISA fiduciaries of the Plans.  *Id.*; *see* 29 U.S.C. § 1102(a)(1).  Nationwide's annuity products provided a platform for participants in retirement plans such as 401(k) plans to allocate their contributions to various investment options corresponding to mutual funds.  A3.  Each annuity product included a standard menu of mutual fund investment options, which trustees could evaluate when deciding whether or not to select the Nationwide product.  *See generally* A3-A4.  In most instances, trustees selected a subset of those options to include in a more limited menu for Plan participants.  For example, the Crown Tool & Die plan signed a group annuity contract application that included 16 possible mutual fund investment options; the trustee chose six for participants.  *See* Rose Decl. ¶ 8 (Exhibit to Opp. to Class Cert.), Dist. Ct. Doc. No. 473.  Trustees often made these decisions in conjunction with their brokers, pension plan administrators, or fiduciary investment advisers.  *See* Opp. to Class Cert., Dist. Ct. Doc. No. 473, at 11-12.  Plan participants then decided how to allocate their funds.  Nationwide allocated Plan funds into various investment options *only* as directed by the Plans and their participants.

2.     Like other providers, Nationwide received payments from various

mutual funds that were included as investment options in the annuity products.  A4.

The purpose of this so-called revenue sharing is straightforward.  Providers like

Nationwide incur significant marketing, servicing, and distribution costs in making

their products and the associated investment options available to the market.  The

mutual fund companies, in turn, value the annuity products as a channel to reach

potential customers while avoiding certain costs.  Revenue sharing subsidizes plan

costs and thus lowers the prices of the investment options to plan participants.  *See*

*Leimkuehler v. American United Life Ins. Co.*, 713 F.3d 905, 908-910 (7th Cir.

2013) (describing arrangements used by annuity providers like Nationwide).

3.     Nationwide's revenue sharing agreements with mutual funds provided

that it would receive payments in recognition of the services provided by

Nationwide in connection with its products.  *See Haddock v. Nationwide Fin. Servs.,*

*Inc.*, 262 F.R.D. 97, 129 (D. Conn. 2009) ("*Haddock II*").  The mutual funds would

incur costs if they performed these services themselves and distributed their funds

directly.  Nationwide's services included the aggregation of thousands of

transactions by annuity contract holders into a single daily "omnibus trade" in each

fund, distribution and marketing services, government and tax reporting services,

and accounting reconciliation.  *See id.*  The revenue sharing payments were made

from the mutual fund's assets (or those of its affiliates).  *See Haddock v. Nationwide Fin'l Servs., Inc.*, 419 F. Supp. 2d 156, 168 (D. Conn. 2006) ("*Haddock I*").

During the period when revenue sharing arrangements were adopted, Nationwide notified many Plans of revenue sharing and offered many Plans price discounts on the investment options that corresponded to mutual funds from which Nationwide received revenue sharing.  *See Haddock II*, 262 F.R.D. at 118.  Many trustees expressly agreed to contract amendments implementing the price discounts based on revenue sharing.  Nationwide later incorporated disclosures of revenue sharing into its annuity contracts and prospectuses.  Throughout the relevant period, all product fees charged to Plan participants—Nationwide's annuity charges and the fees of the mutual funds included as investment options—were disclosed to Plans and participants.  Plaintiffs do not base their class claims on any alleged disclosure failures by Nationwide.  *See Haddock I*, 419 F. Supp. 2d at 168.

4.    In 2001, Plaintiffs—the *named fiduciaries* for their Plans—brought suit against Nationwide claiming that Nationwide acted as a *functional* fiduciary to the extent that it negotiated for and received revenue sharing, that Nationwide also breached fiduciary duties under 29 U.S.C. § 1104(a)(1)(A) and (B) by the same receipt of revenue sharing,[2] and engaged in prohibited transactions under 29 U.S.C. § 1106(b)(1) and (3) by entering into the revenue sharing arrangements.  A5.

---

[2] The full text of the ERISA provisions at issue is provided in the addendum.  *See* A30-33.

Because Nationwide is not a named fiduciary to any Plan, ERISA requires Plaintiffs to prove that Nationwide engaged in particular *actions* that constituted "exercise[s]" of "authority or control respecting management or disposition" of the Plans' assets. 29 U.S.C. § 1002(21)(A)(i).  ERISA also requires Plaintiffs to prove that Nationwide was exercising such fiduciary functions when it engaged in any challenged conduct (*i.e.*, here, receipt of revenue sharing).  *See Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) ( ERISA requires proof that "person was acting as a fiduciary … when taking the action subject to complaint").

Designing a variable annuity product with mutual fund investment options that are subject to separate revenue-sharing agreements is not a fiduciary act under ERISA.  *See Leimkuehler*, 713 F.3d at 911-914; *Hecker v. Deere & Co.*, 556 F.3d 575, 583 (7th Cir. 2009).  During the 12-year history of this litigation, accordingly, Plaintiffs have advanced several particularized theories for treating Nationwide as a fiduciary.  In its 2009 and 2013 class certification orders, the district court blessed two such theories.  First, the court held that Plaintiffs may attempt to prove that Nationwide "'leveraged'" its control of Plans' assets to "'extract'" revenue sharing payments from mutual funds.  A17.  Under this theory, "[P]laintiffs claim … that Nationwide *actively used* its control of plan assets *to bargain for* revenue sharing payments from the mutual funds that Nationwide offers as investment options." *Haddock II*, 262 F.R.D. at 107 (emphasis added).  Plaintiffs call this their "specific

8

accumulation unit" theory.[3]  Second, the court held that Plaintiffs may seek to prove that Nationwide exercised its "ability to select, remove and replace the mutual funds that would be offered as investment options" to extract revenue sharing.  A17.  Plaintiffs call this their "mutual fund selection" theory.  Plaintiffs seek injunctive relief and an order requiring Nationwide to disgorge all the revenue sharing payments it received.  A7.

5.    In 2009, the district court certified a class under Rule 23(b)(2).  *See Haddock I*, 262 F.R.D. at 131.  This Court granted Nationwide's petition to appeal that order under Rule 23(f) and vacated the order.  *See Nationwide Life Ins. Co. v. Haddock*, 460 F. App'x 26-29 (2d Cir. 2012) ("*Haddock III*").  This Court explained that the intervening decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), had changed the standard for Rule 23(b)(2) certification and precluded "the type of non-incidental, individualized proceedings for monetary awards" that would be required to "establish[] Nationwide's liability on the disgorgement issue."  460 F. App'x at 29.  The decision noted that Plaintiffs' request for Rule 23(b)(3) certification remained unresolved and "remand[ed] the case for reconsideration of plaintiffs' motion for class certification in light of the Supreme Court's decision in *Wal-Mart*."  *Id.*  The Court further explained that arguments about whether

---

[3] A participant's holdings of a particular investment option are denoted in "accumulation units."  The value of the accumulation units is linked to the performance of the underlying mutual fund.  A4.

"plaintiffs' case will require individualized proof" were "a matter for the district court to consider on remand in applying Rule 23(b)(3)." *Id.* at 28 n.2.

6.    The district court took up Rule 23(b)(3) certification on remand. The court concluded that *Wal-Mart* "did nothing to change" the predominance inquiry and had "little to no bearing on the narrow determinations" the court was to make under Rule 23(b)(3). A11. It reached this conclusion despite this Court's direction to consider Rule 23(b)(3) certification "in light of the Supreme Court's decision in *Wal-Mart*" and despite the Supreme Court's admonition in *Comcast* that "[t]he same analytical principles" applied in *Wal-Mart* also "govern Rule 23(b)." *Comcast*, 133 S. Ct. at 1432. The district court held that common issues predominated because Plaintiffs' ERISA claims could be resolved by reference to the common "'structural nature of Nationwide's contractual relationship with the Plans.'" A18, A21. The court also held that individual issues of ratification and "pass through" of revenue sharing were "individualized damages issues" and "monetary relief" issues that did not preclude a predominance finding. A23-24.

## STANDARD FOR GRANTING REVIEW

A party seeking review under Federal Rule of Civil Procedure 23(f) generally must demonstrate "'*either* (1) that the certification order will effectively terminate the litigation and there has been a substantial showing that the district court's decision is questionable, *or* (2) that the certification order implicates a legal question

10

about which there is a compelling need for immediate resolution.'"  *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 76 (2d Cir. 2004) (quoting *In re Sumitomo Copper Litig.*, 262 F.3d 134, 139 (2d Cir. 2001)).  In addition, because "courts of appeals have 'unfettered discretion' to authorize an appeal under Rule 23(f)," *Sumitomo*, 262 F.3d at 138, "a petition failing to satisfy either of the foregoing requirements may nevertheless be granted where it presents special circumstances that militate in favor of an immediate appeal," *id.* at 140.  These standards are amply satisfied in this case.

## REASONS FOR GRANTING THE PETITION

### I.   CLASS CERTIFICATION WAS ERRONEOUS

#### A.   The District Court Failed To Identify Any Common Classwide Evidence That Actually Supports The Only Theories It Approved

The decision in *Comcast Corp. v. Behrend* is the Supreme Court's latest pronouncement on the principles governing the Rule 23(b)(3) predominance inquiry.  The decision holds that Rule 23(b)(3) predominance is not established unless a court, after conducting a rigorous analysis, identifies common classwide evidence that is actually tied to the classwide theory of liability on which the case is to proceed.  In *Comcast*, the lower court concluded that a disconnect between the offered proof and the theory of liability—there, between plaintiffs' proof of antitrust injury and the only liability theory the court approved—posed no obstacle to predominance.  *See* 133 S.Ct. at 1433.  It thus certified a class based on common evidence that could not prove injury from the only liability theory that the court

11

had approved.  *See id.* at 1433-1434.  The Supreme Court had no difficulty

concluding that this was error.  As the Court explained, under the lower court's

logic, "at the class-certification stage *any* [proof] is acceptable so long as it can be

applied classwide, no matter how arbitrary [it] may be."  *Id.*  That proposition

"would reduce Rule 23(b)(3)'s predominance requirement to a nullity."  *Id.*

The district court made the same error here.  The court approved only two

theories of liability, each of which purportedly would distinguish Nationwide's

actions from the standard, lawful, and non-fiduciary practice of insurance

companies providing variable annuity products that contain investment options

subject to mutual fund revenue sharing agreements.  *See Leimkuehler*, 713 F.3d at

911-914.  The court failed, however, to identify any *actual* common classwide

evidence tied to either liability theory.

*First*, the court identified no actual classwide evidence for the theory that

Nationwide "'leveraged'" the Plans' assets to "'extract the revenue sharing

payments from the mutual funds.'"  A17.  Under this theory, Nationwide allegedly

"*actively used* its control of plan assets *to bargain for* revenue sharing payments

from the mutual funds that Nationwide offers as investment options."  *Haddock II*,

262 F.R.D. at 107 (emphasis added).  Yet the court identified no evidence—

classwide or otherwise—showing that Nationwide "actively used" or "leveraged"

every Plan's money "to bargain for" and "extract" revenue sharing from the mutual

funds.  For example, the court cited no evidence of any Nationwide interaction with any mutual fund.  In fact, during the class certification hearing, the court opined—contrary to the "active use" or "bargaining" legal theory it recognized—that "[i]t doesn't matter what the negotiations were with the mutual funds" and explained that it did not "think that's any part of this case."  Class Cert. Hr'g Tr. 49:15-17 (Dist. Ct. Doc. No. 505).  This is no mere quibble.  The court has yet to explain, for example, how Nationwide could have "actively used" any alleged control over a Plan's assets to bargain for revenue sharing from a mutual fund if, as was the case for many Plans, Nationwide negotiated the relevant mutual fund revenue sharing agreements *years before* the Plan ever selected a Nationwide product and allocated money to the mutual funds.

Instead, the court certified a class based on an envisioned future trial concerning solely "'the structural nature of Nationwide's contractual relationship with the Plans.'"  A18 (quoting *Haddock II*, 262 F.R.D. at 125).  According to the court, "Nationwide's uniform investment process … is evidenced by the standardized terms contained in the annuity contracts that governed Nationwide's relationship with the Plans and participants."  A21.  But those contracts cannot answer the questions presented by Plaintiffs' first theory.  The existence of certain terms in Nationwide's annuity contracts with the Plans says nothing about what did or did not take place in discussions between Nationwide and mutual funds, much

13

less whether Nationwide "actively used" any alleged control of Plan assets during any such meetings "to bargain for" revenue sharing payments.  The court did not identify any other common classwide evidence in support of its Rule 23(b)(3) predominance finding, and thus failed to find, as required by *Comcast*, that its "leverage" theory could *in fact* be resolved through common classwide evidence.

*Second*, the court failed to identify any connection between any common evidence and the "mutual fund selection" theory.  A17.  That theory would require Plaintiffs to prove that Nationwide exercised control over a *Plan's* investment options—not a *product's* investment options—without trustee direction in order to obtain revenue sharing.  *See* 29 U.S.C. § 1002(21)(A)(i); *Leimkuehler*, 713 F.3d at 911-914.  But the court identified no common classwide evidence showing that Nationwide's selection of investment options and negotiation of revenue sharing in designing the annuity products for the market—well before it had *any* conceivable fiduciary relationship with a particular Plan—could translate into the exercise of control over that Plan's assets to obtain revenue sharing.  *See F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1259 (2d Cir. 1987).  The court evidently believed that such "timing" issues are irrelevant, *Haddock II*, 262 F.R.D. at 124, and apparently will not allow Nationwide to present plan-by-plan evidence to rebut Plaintiffs' allegations of fiduciary conduct.  Nor, apparently, will the court allow Nationwide to show that many mutual funds paid revenue sharing not based on any

14

alleged control over Plan assets, but based on the value those funds attached to Nationwide's products and services. Rather, the court allowed trial of the "selection" theory to proceed based on the same evidence of "Nationwide's contractual relationship with the Plans." A18.

As in *Comcast*, that generalized evidence is not tethered to the only theories in the case. Proof of those theories necessarily turns on the *particular actions* Nationwide allegedly took that constituted an exercise of "authority or control respecting management or disposition of [a Plan's] assets." 29 U.S.C. § 1002(21)(A)(i); *see Leimkuehler*, 713 F.3d at 914 ("In contrast to a named fiduciary, a functional fiduciary under Section 1002(21)(A) owes a duty to a plan through its actions"). By relying on such generalized evidence simply because "it can be applied classwide," the district court effectively "reduce[d] Rule 23(b)(3)'s predominance requirement to a nullity." *Comcast*, 133 S. Ct. at 1433.[4]

*         *         *

To be clear, Nationwide does not believe that either of the theories the district court found "viable" (A19) are legally viable at all. The Seventh Circuit decisively rejected both theories in *Leimkuehler*, a seminal decision that Nationwide brought to

_____

[4] Although *Comcast* was decided after the principal briefs on Plaintiffs' motion were filed, Nationwide brought the decision to the district court's attention in a notice of supplemental authority, to which Plaintiffs responded. *See* Dist. Ct. Doc. Nos. 507, 508. Despite this briefing, the district court failed even to cite *Comcast*, much less acknowledge the issues raised by the decision.

the district court's attention.  The district court never cited the decision, much less explained how Plaintiffs' theories could survive the Seventh Circuit's holdings.  That is itself a problem under Second Circuit law.  An obviously meritless claim should not be certified for class treatment.  *See McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 228 (2d Cir. 2008) ("when a claim cannot succeed as a matter of law, the Court should not certify a class on that issue" (internal quotation marks omitted)).  As this Court has explained, a district court should resolve merits issues "in the first instance" where it "will necessarily inform and perhaps moot … analysis of many class certification issues." *Authors Guild, Inc. v. Google Inc.*, 721 F.3d 132, 134 (2d Cir. 2013).  But even accepting the district court's view of the viability of Plaintiffs' theories, Rule 23(b)(3) certification was plainly improper because the court did not find, and could not have found, that either theory could be proved through any actual, classwide, common evidence.

**B.    The District Court Erroneously Treated Individual Liability Issues As Individualized Damages And Monetary Relief Issues That Could Be Deferred For Later Plan-By-Plan Proceedings**

The district court's predominance finding also effectively gutted two of Nationwide's substantial individual liability defenses—ratification and "pass through" of revenue sharing.  Both issues go to whether Plaintiffs can prove (as is their burden) that Nationwide breached any fiduciary obligations owed to a particular Plan.  If a Plan trustee consented to or ratified Nationwide's receipt of

16

revenue sharing, Nationwide cannot be held liable for an ERISA breach.  *See McManus & Pellouchoud, Inc. Emps.' Profit Sharing Trust v. L.F. Rothschild, Unterberg, Towbin*, 1989 WL 100103, at *4 (N.D. Ill. Aug. 23, 1989) ("[e]ven the stringent duties imposed by ERISA do not create … liability where [a person] acts with the approval and at the direction of a plan Trustee").  Nationwide likewise cannot be held liable for fiduciary breach or disgorgement if it passed through the full value of the revenue sharing payments to a Plan.  In that circumstance, Nationwide acted "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan," 29 U.S.C. § 1104(a)(1)(A), and did not obtain any "profits … through use of assets of the plan," *id.* § 1109(a).

Nationwide presented substantial individual Plan evidence of both issues to the court below.  On ratification, Nationwide presented unrebutted evidence that many trustees knew of Nationwide's receipt of revenue sharing—through Nationwide's disclosures, Plan advisers, contract amendments, or other means— and consented to the practice at various times and in various ways throughout the class period. *See supra* p. 7.  Nationwide also offered substantial evidence that it passed the value of revenue sharing payments through to various Plans, largely in the form of price discounts on revenue-sharing-paying funds selected by each Plan. Adjudicating both issues would thus require Plan-specific inquiries into what each

Plan trustee knew about Nationwide's revenue sharing practices, when he or she knew it, and how much each Plan benefitted.

The district court took almost no account of these issues and erroneously treated both as issues of "monetary relief" that, even if "individualized," could be handled through "management tools" such as bifurcation, a special master, "or even decertification *after a finding of liability*." A24 (emphasis added). That was clearly error. *See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.,* 601 F.3d 1159, 1179 (11th Cir. 2010) ("It was a clear error of judgment to brush [ratification and waiver] aside as mere 'damages' issues.").

The court literally said *nothing* about ratification, apparently believing that classifying the issue as "monetary relief" was enough—despite the fact that ratification is a *liability* issue that goes to the question of whether there was any breach at all with respect to a particular Plan. *See* A23. It cannot be left for a special master to resolve later. On pass-through, the court treated it merely as a question of *how much* disgorgement the class could recover. But if Nationwide passed through all revenue sharing payments received—either in the form of price discounts or services rendered—then there is no breach of fiduciary duty at all.[5]

---

[5] The district court's specific explanation was that "a reasonable fact-finder could conclude that the entire value of the revenue sharing payments is 'profit' eligible [for disgorgement]." A23 (internal quotation marks and emphasis omitted). Even were that relevant to the *liability* issue (it is not), the finding would be wholly insufficient under Rule 23 because it is merely an articulation of *one side's*

Nationwide is entitled to present individual plan-by-plan proof of these liability defenses at trial, and certification cannot strip it of that right. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2561 (2011) ("a class cannot be certified on the premise that [the defendant] will not be entitled to litigate its statutory defenses to individual claims"). But even if these issues were simply "monetary relief" issues, *Comcast* itself holds that a plaintiff's inability to establish common proof of damages can serve to defeat Rule 23(b)(3) predominance. *See Comcast*, 133 S. Ct. at 1432-1433. If the issues of ratification and pass through, however categorized, are individualized and substantial issues in the litigation, then they predominate—full stop. Indeed, in seeking to relegate Nationwide's defenses to some undefined second phase, even the district court implicitly recognized the incompatibility of the issues with a class proceeding.

## II.    THERE IS A COMPELLING NEED TO ADDRESS THE QUESTION PRESENTED

This case yet again requires this Court's immediate intervention. First, the nature of classwide proof required in an ERISA class action like this is an important and recurring question. Various plaintiffs around the nation, including in the Second Circuit, have brought similar class actions seeking huge disgorgement sums. *See,*

---

argument, and not an assessment of the inquiry for trial. *See In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006). In any event, the expert report on which the court relied (A23) was clearly flawed because it took no account of the fact that revenue sharing was passed through to Plans in the form of discounts on revenue-sharing-paying investment options. *See* Ex. B to Sur-Reply in Opp. to Class Cert., Dist. Ct. Doc. No. 382-2 (Monsowitz Dep. 163:3-9).

*e.g.*, *Healthcare Strategies, Inc. v. ING Life Ins. & Annuity Co.*, No. 11-282, Order, Doc. No. 102 (D. Conn. Sept. 27, 2012) (certifying class seeking approximately $750 million in disgorgement and prejudgment interest); *Santomenno v. John Hancock Life Ins. Co.*, 2013 WL 3864395, at *1 (D.N.J. July 24, 2013) (dismissing putative class action seeking disgorgement of revenue sharing). Nationwide's receipt of revenue sharing is consistent with standard and widely disclosed practices in the retirement plan industry. *See Leimkuehler*, 713 F.3d at 908-10. Certifying a class without any common proof of Plaintiffs' liability theories threatens the entire plan provider industry with *de facto* invalidation of revenue sharing—contrary to the Seventh Circuit's rulings that the practice is entirely lawful.

Second, the stakes in this litigation are very high: the district court's decision effectively puts Nationwide's ERISA annuity business on trial, with the prospect of having to disgorge an entire stream of revenues integral to its business, for a nearly 18-year period. There is a significant danger that the important questions in this case are "likely to escape effective review" after final judgment. *Sumitomo*, 262 F.3d at 140. That danger, along with the clearly "questionable" nature of the certification decision, should prompt the Court to grant the petition. *Id.* at 139.

## CONCLUSION

For the foregoing reasons, permission to appeal should be granted.

Respectfully submitted,

_signature_

DAVID W. BOWKER                              CHARLES C. PLATT
DANIEL P. KEARNEY, JR.                       NOAH A. LEVINE
WILMER CUTLER PICKERING                      WILMER CUTLER PICKERING
   HALE AND DORR LLP                             HALE AND DORR LLP
1875 Pennsylvania Avenue, NW                 399 Park Avenue
Washington, DC  20006                        New York, NY  10022
(202) 663-6000                               (212) 230-8800

THOMAS F. CLAUSS , JR.
WIGGIN AND DANA LLP
Two Stamford Plaza
281 Tresser Boulevard
Stamford, CT  06901
(203) 363-7610

*Attorneys for Defendant-Petitioner Nationwide Life Insurance Company*

Dated: September 20, 2013

## CERTIFICATE OF SERVICE

I hereby certify that, on this 20th day of September, 2013, I caused a copy of the foregoing Petition of Defendants-Petitioners for Permission to Appeal Pursuant to Federal Rule of Civil Procedure 23(f) to be served by overnight carrier and electronic mail upon counsel at the addresses below:

Richard Bieder, Esq.
Antonio Ponvert, III, Esq.
Neal A. DeYoung, Esq.
William M. Bloss, Esq.
Koskoff, Koskoff & Bieder, P.C.
350 Fairfield Ave., 5th Floor
Bridgeport, CT 06604
rbieder@koskoff.com
aponvert@koskoff.com
ndeyoung@koskoff.com
bbloss@koskoff.com

Gregory G. Jones, Esq.
Law Firm of Gregory G. Jones, P.C.
603 S. Main, Suite 200
Grapevine, TX 76051
greg@gjoneslaw.com

Marc R. Stanley, Esq.
Martin Woodward, Esq.
Stanley.Iola, LLP
3100 Monticello Ave., Suite 750
Dallas, TX 75205
mstanley@mac.com
mwoodward@stanleyiola.com

Roger L. Mandel, Esq.
Lackey Hershman LLP
3102 Oak Lawn, Suite 777
Dallas, TX 75219
rlm@lhlaw.net

Samuel Issacharoff
New York University
40 Washington Square South, 411J
New York, NY 10012
si13@nyu.edu

NOAH A. LEVINE

## CERTIFICATE OF ELECTRONIC FILING

I hereby certify that, on this 20th day of September, 2013, I caused a pdf version of the Petition of Defendants-Petitioners for Permission to Appeal Pursuant to Federal Rule of Civil Procedure 23(f) and accompanying appendix to be sent by electronic mail to newcases@ca2.uscourts.gov.  Prior to transmittal, the pdf was scanned for viruses and no viruses were detected.

NOAH A. LEVINE

# ADDENDUM

# ADDENDUM
# TABLE OF CONTENTS

Page

Ruling on Plaintiffs' Renewed Motion for Class Certification, Dist. Dkt.
517, filed September 6, 2013 ........................................................................A1

Order of Class Certification, Dist. Dkt. 518, filed September 6, 2013 ................A27

29 U.S.C. § 1002(21) [ERISA § 3(21)] .................................................................A30

29 U.S.C. § 1104(a) [ERISA § 404(a)], Fiduciary Duties ...................................A31

29 U.S.C. § 1106(b) [ERISA § 406(b)], Prohibited Transactions .......................A32

29 U.S.C. § 1109 [ERISA § 409], Liability for breach of fiduciary duty ............A33

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LOU HADDOCK, as trustee of the Flyte
Tool & Die Company, Inc. 401-K Profit
Sharing Plan, et al.,

      Plaintiffs,

        v.

NATIONWIDE FINANCIAL SERVICES,
INC. and NATIONWIDE LIFE
INSURANCE COMPANY,

      Defendants.

No. 3:01-cv-1552 (SRU)

## RULING ON PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION

      The plaintiffs, Peter Wiberg, Alan Gouse, Christopher Anderson, and H. Grady

Chandler,[1] trustees of employer-sponsored profit-sharing retirement plans (collectively, the

"Trustees" or the "plaintiffs"), brought this action against Nationwide Financial Services, Inc.

and Nationwide Life Insurance Co. (collectively, "Nationwide"), asserting breach of fiduciary

duty claims under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1101, *et*

*seq.* ("ERISA"). On November 6, 2009, I granted the plaintiffs' motion to proceed with those

claims on a class-action basis, certifying the class under Federal Rule of Civil Procedure

23(b)(2). *See Haddock v. Nationwide Fin. Services, Inc.*, 262 F.R.D. 97 (D. Conn. 2009). The

Second Circuit granted Nationwide leave to appeal, and while that appeal was pending, the

United States Supreme Court decided the landmark case of *Wal-Mart Stores, Inc. v. Dukes*, 131

S. Ct. 2541 (2011), a decision that, among other things, narrowed Rule 23(b)(2)'s reach over

---

[1] Plaintiffs Lou Haddock and Edward Kaplan voluntarily dismissed their claims against
the defendants and have withdrawn as representative plaintiffs in this litigation (docs. # 297 & #
298). Christopher Anderson was substituted as a plaintiff for Dennis Ferndon (docs. # 296 & #
300), and H. Grady Chandler was subsequently permitted to intervene as a plaintiff (doc. # 416).

class complaints seeking individual claims for monetary relief in addition to injunctive or declaratory relief.  Thereafter, on February 6, 2012, the Second Circuit issued a summary order vacating the class certification order under Rule 23(b)(2) in light of *Wal-Mart* and remanding the case with instructions to consider class certification under Federal Rule of Civil Procedure 23(b)(3).  *See Nationwide Life Ins. Co. v. Haddock*, 460 F. App'x 26 (2d Cir. 2012).  Now pending is the plaintiffs' renewed motion for class certification under Rule 23(b)(3),[2] which has been the subject of additional briefing by both parties.[3]  For the reasons that follow, the plaintiffs' renewed motion (doc. # 299) is GRANTED.

## I.    Background

The court presumes familiarity with the facts and procedural history of this case, which have been set forth comprehensively in four previous rulings.  *See Haddock v. Nationwide Fin. Servs.* ("*Haddock I*"), 419 F. Supp. 2d 156 (D. Conn. 2006); *Haddock v. Nationwide Fin. Servs.* ("*Haddock II*"), 514 F. Supp. 2d 267 (D. Conn. 2007); *Haddock v. Nationwide Fin. Servs.* ("*Haddock III*"), 570 F. Supp. 2d 355 (D. Conn. 2008); *Haddock v. Nationwide Fin. Servs.* ("*Haddock IV*"), 262 F.R.D. 97 (D. Conn. 2009).  What follows merely provides the factual

---

[2] The plaintiffs' original motion called for class certification of the claims contained in the Fifth Amended Complaint.  *See* Pls.' Mot. For Class Certification (doc. # 299).  However, after granting certification under Rule 23(b)(2), as well as granting H. Grady Chandler's motion to intervene, I permitted the plaintiffs to file a Sixth Amended Complaint so that all class representatives would have one operative pleading.  *See* Stipulation and Order Re: Filing of Operative Pleadings (doc. # 421).  Thus, although the renewed motion for class certification references the Fifth Amended Complaint, the plaintiffs are, as a technical matter, seeking class certification of the claims contained in the Sixth Amended Complaint.

[3] The parties' original briefing on the question of class certification consisted of the following: (1) Pls.' Mot. For Class Certification (doc. # 299); (2) Defs.' Opp'n (doc. # 338); (3) Pls.' Mem. In Reply (doc. # 360); (4) Defs.' Sur-Reply (doc. # 382); and (5) Pls.' Sur-Response (doc. # 385).  Following the Second Circuit's mandate, I permitted the parties to submit additional briefing on certification under Rule 23(b)(3), which consisted of the following:  (1) Defs.' Opp'n to Pls.' Renewed Mot. For Class Certification (doc. # 473); (2) Pls.' Reply (doc. # 478); and (3) Defs.' Sur-Reply (doc. # 479).  Both parties also submitted numerous notices of

background pertinent to the instant motion.

      A.    <u>Factual Background</u>

The plaintiffs are trustees of qualified ERISA pension benefit plans (collectively, "the Plans") that held group and/or individual annuity contracts with Nationwide. The employers of various plan participants contracted with Pension Plan Administrators ("PPAs") to provide the necessary administrative services for the Plans. Those PPAs then persuaded each Plan to select Nationwide as their "investment provider," which earned the PPAs a commission from Nationwide.

Nationwide provided the Plans with various investment options, including insurance products known as "variable annuities" contracts. Those contracts came in two basic types: "group" and "individual." With group variable annuity contracts, Nationwide contracted only with the Plans, but each participant had an individual account. With the individual annuity contracts, Nationwide contracted directly with plan participants. Both types of variable annuity contracts permitted the Plans and participants to invest in a variety of mutual funds.

Briefly stated, that investment process worked as follows. Nationwide provided the Plans and participants a list (or "menu") of mutual funds for potential investment. For group variable annuity contract-holders, the Plans then chose a subset of mutual funds and their participants made investment choices from that subset. Plans were free to select as many or as few of the investment options as they wanted, and were under no obligation to select any investment options at all. For individual variable annuity contract-holders, the participants chose which mutual funds to invest in from Nationwide's menu of available options.

For the group variable annuity contracts, Nationwide retained the authority to delete and

supplemental authority. I have considered all of these documents in reaching my decision.

substitute mutual funds from the list, "if, in the judgment of [Nationwide], further investment in the shares of a Fund should become inappropriate in the view of the purposes of the Contract." The individual variable annuity contracts issued prior to 1998 did not contain this exact language, but Nationwide does not dispute that it retained the authority to remove mutual funds after participants selected them for inclusion in their individual variable annuity contract. Individual contracts issued after 1998, however, did contain the language referenced above.

After the Plans and participants chose which mutual funds they wanted from Nationwide's menu, rather than investing directly in the chosen mutual funds, pension contributions and employer-matching contributions were invested in "variable accounts" established by Nationwide. Those variable accounts were further sub-divided into numerous "sub-accounts" that corresponded to the different investment options. Once the Plans and participants selected the mutual funds in which to invest their pension contributions, Nationwide allocated those pension funds to the appropriate sub-accounts. The sub-accounts received allocations from multiple Plans and participants, and Nationwide purchased or sold a designated mutual fund to reflect the sub-accounts' combined allocations by the Plans and their participants. Put differently, when the mutual fund received funds from the sub-accounts, those funds were pooled with funds from other investors.

To reflect the amounts contributed to particular mutual funds, Nationwide allocated "accumulation units," i.e., shares of the corresponding sub-accounts, to the Plans and participants. The accumulation units reflected the Plans' and participants' total investment in the variable account or sub-account. The value of those accumulation units fluctuated according to the value of the mutual fund shares held within the sub-account.

Pursuant to its contracts with the Plans and participants, Nationwide had the authority to

**A4**

cancel the accumulation units as necessary to pay its fees and to pay taxes.  Nationwide also transferred accumulation units for use as collateral for loans, and canceled them to purchase annuities and make cash payments at the request of the Plans and participants.

In the mid-1990s, Nationwide began collecting income—sometimes referred to as "revenue sharing payments"—from the mutual funds listed on its menu of investment options. Those payments were based on a percentage of the assets invested in the mutual funds through Nationwide.  According to the plaintiffs, that process allowed Nationwide to leverage its large pool of pension contributions to extract additional payments from mutual funds seeking access to the Plans and their money.

In their Sixth Amended Complaint, the plaintiffs contend that Nationwide's investment process and receipt of the revenue sharing payments breached fiduciary duties under ERISA.  To prevail on that claim, the Trustees must successfully prove (1) that Nationwide was a fiduciary to the Plans, and (2) that Nationwide's acceptance of revenue sharing payments from the mutual funds was a breach of its fiduciary duties. The Trustees have advanced two theories to show how Nationwide acted as a fiduciary with respect to the Plans: (1) the "specific accumulation unit" theory, and (2) the "mutual fund selection" theory.  They contend that Nationwide's conduct in collecting revenue sharing payments amounted to a breach of fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), and also constituted prohibited transactions in violation of ERISA § 406(b)(1) and (3), 29 U.S.C. § 1106(b)(1) and (3).  On that basis, the plaintiffs seek to certify a Rule 23(b)(3) class of trustees of all ERISA-covered employee benefit plans that formerly held, or continue to hold, group and/or individual variable annuity contracts with Nationwide.

B.    Prior Class Certification Under Rule 23(b)(2)

On November 6, 2009, I granted the plaintiffs' motion for class certification, certifying the class under Rule 23(b)(2).  *See Haddock IV*, 262 F.R.D. at 131.  First, I determined that the four prerequisites of Rule 23(a) were met:  numerosity, commonality, typicality, and adequacy of representation.  *Id.* at 116-20.  Relevant to our purposes here, I identified the following questions of fact or law common to the class:

- Whether Nationwide constitutes a fiduciary pursuant to the specific accumulation theory;

- Whether Nationwide constitutes a fiduciary pursuant to the mutual fund selection theory;

- Whether Nationwide, in arranging for, receiving and retaining the revenue sharing payments, discharged its duties with respect to the Plans solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries or defraying reasonable expenses of administering the Plans (i.e., whether Nationwide violated ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A));

- Whether Nationwide, in arranging for, receiving and retaining the revenue sharing payments, discharged its duties with respect to the Plans solely in the interest of the participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims (i.e., whether Nationwide violated ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B));

- Whether Nationwide dealt with the assets of the Plans (accumulation units and the underlying mutual fund shares in the case of group annuity contracts) in its own interest or for its own account (i.e., whether Nationwide violated ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1));

- Whether Nationwide received any consideration (the revenue sharing payments) for its personal account from any parties (mutual fund families) dealing with the Plans in connection with transactions (the revenue sharing contracts) involving the assets of the Plans (the accumulation units and the underlying mutual fund shares in the case of the group annuity contracts) (i.e., whether Nationwide violated ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3));

- 6 -

**A6**

• Whether any part of the revenue sharing payments constitutes payments by the mutual fund families to Nationwide for services rendered by Nationwide to the mutual fund families;

• Whether Nationwide passed on any part of the revenue sharing payments to the Plans;

• Whether the Class is entitled to an injunction requiring Nationwide to disgorge all revenue sharing in the future pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3); and

• Whether the Class is entitled to disgorgement/restitution of all past revenue sharing pursuant to ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2).

*Id.* at 116-17. With respect to commonality under Rule 23(a)(2), I determined that, "[a]t a minimum, the questions of law raised by the Trustees are applicable to each member of the putative class . . . that is, that Nationwide breached its fiduciary duty (under one of the legal theories set forth by the Trustees) to the Plans and participants by accepting revenue sharing payments from mutual funds that it offered as investment options to its variable annuity contract-holders." *Id.* at 117. Moreover, "[b]ecause all the Trustees' claims arise from the same practice or course of conduct that gives rise to the claims of proposed Class members—namely, that Nationwide accepted revenue sharing payments from those mutual funds that it offered as investment options to annuity contract-holders in violation of its fiduciary duties to the Plans," I concluded that the plaintiffs had established typicality under Rule 23(a)(3). *Id.*

Having determined that the plaintiffs satisfied the Rule 23(a) prerequisites, I went on to hold that the class could be certified under Rule 23(b)(2) because Nationwide "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." *Parker v. Time Warner Entm't Co.*, 331 F.3d 13, 18 (2d Cir. 2003) (quoting Fed. R. Civ. P. 23(b)(2)). Citing the Second Circuit's approach in *Robinson v. Metro-North Commuter Railroad Co.*, 267 F.3d 147

- 7 -

(2d Cir. 2001), I concluded that, although the plaintiffs were seeking monetary relief

(disgorgement) in addition to the injunctive and declaratory relief expressly provided for under

Rule 23(b)(2), the claims for injunctive and/or declaratory relief "predominated," and therefore a

(b)(2) class was appropriate. *See Haddock IV*, 262 F.R.D. at 130-31. An order certifying the

class issued that same day. S*ee* Order of Class Certification (doc. # 417). Nationwide later

sought and was granted leave to appeal the class certification order.

      C.    <u>*Wal-Mart* and its Effects</u>

      During the pendency of the appeal, the United States Supreme Court handed down its

decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011). The *Wal-Mart* decision

essentially did two things. First, it increased the "rigor" with which courts must analyze the

threshold element of "commonality" under Rule 23(a)(2). The Court explained that plaintiffs

seeking class certification "must be prepared to prove that there are *in fact* sufficiently . . .

common questions of law or fact," that the class members have "suffered the same injury," and

that their claims "depend upon a common contention . . . of such a nature that it is capable of

classwide resolution—which means that determination of its truth or falsity will resolve an issue

that is central to the validity of each one of the claims in one stroke." *Id*. at 2551. In other

words, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even

in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to

drive the resolution of the litigation." *Id.* (internal quotation omitted).

      Second, *Wal-Mart* narrowed Rule 23(b)(2)'s reach over class complaints seeking

individual claims for monetary relief in addition to injunctive or declaratory relief. Specifically,

the Court held that Rule 23(b)(2) does not authorize class certification of claims seeking

monetary relief "at least where . . . the monetary relief is not *incidental* to the injunctive or

declaratory relief."  131 S. Ct. at 2557 (emphasis added).  The Court reasoned that, because

members of a (b)(2) class are not entitled to the notice and opt-out provisions afforded members

of a (b)(3) class, due process required "that individualized monetary claims belong in Rule

23(b)(3)."  *Id.* at 2558.  This holding was significant, particularly for the Second Circuit, which

had long held that a (b)(2) class could include claims for monetary relief so long as individual

monetary claims did not predominate over claims for injunctive and/or declaratory relief.  *See*

*Robinson*, 267 F.3d at 164-66.

Thus, *Wal-Mart* upped the ante on "commonality" under Rule 23(a)(2) and narrowed the

application of Rule 23(b)(2).  What it did *not* do, however, was change the analysis to be applied

under Rule 23(b)(3)—i.e., whether common questions "predominate" and whether the class

action device is "superior" to other methods of adjudication.  Indeed, the Court explicitly stated

that the "applicability of [Rule 23(b)(3)] to the plaintiff class is not before us."  *Id.* at 2549 n.2;

*see also Jermyn v. Best Buy Stores, L.P.*, 276 F.R.D. 167, 169 (S.D.N.Y. 2011) ("*Dukes* makes

no new law that impacts in any way this Court's certification of the Rule 23(b)(3) 'damages

class.'"); *Cambridge Lane, LLC v. J-M Mfg. Co.*, No. CV 10-6638-GW, 2012 U.S. Dist. LEXIS

43533 at *5-6 n.2 (C.D. Cal. Mar. 15, 2012) (noting that the predominance requirement of Rule

23(b)(3) "was not at issue in *Dukes*").[4]

---

[4] This is not to say that the commonality and predominance inquiries are unrelated.  On
the contrary, the "common questions" that must predominate under Rule 23(b)(3) are precisely
those "questions of law or fact common to the class' under Rule 23(a)(2).  *See, e.g.*, *Kendler v.
Federated Dep't Stores, Inc.*, 88 F.R.D. 688, 693 (S.D.N.Y. 1981) ("[I]n the absence of a
showing of identifiable common issues, amenable to proof on a class-wide basis, . . . common
issues of law and fact do not predominate herein and plaintiffs have not satisfied the
requirements of Rules 23(a)(2) and 23(b)(3)."); *Frey v. Bekins Van Lines, Inc.*, No. CV 09-5430,
2012 WL 1107719, at *4 (E.D.N.Y. Apr. 2, 2012) ("Issues arising from allegations of
commonality with respect to Rule 23(a) are also relevant to the Rule 23(b)(3) inquiry, which
requires the court to determine whether common questions 'predominate over any questions
affecting only individual members.'") (quoting Fed. R. Civ. P. 23(b)(3)).  *Wal-Mart* may have

D.      <u>The Second Circuit's Mandate</u>

On February 6, 2012, the Second Circuit issued a summary order vacating the order granting class certification under Rule 23(b)(2) in light of *Wal-Mart* and remanding the case with instructions to consider class certification under Rule 23(b)(3). *See Nationwide Life Ins. Co. v. Haddock*, 460 F. App'x 26 (2d Cir. 2012). The Court explained that the decision in *Wal-Mart* "altered the applicable analysis for class certification under Rule 23(b)(2)," and that this court's reliance on *Robinson's* "predominance" test for recovery of monetary damages in addition to injunctive relief was no longer viable. *Id.* at 29. In other words, the legal landscape had changed considerably since the class was certified in this case; after *Wal-Mart*, "unless merely 'incidental' to the requested declaratory or injunctive relief, claims for individualized monetary damages preclude class certification under Rule 23(b)(2)." *Id.* (citing *Wal-Mart*, 131 S. Ct. at 2557-60). On that basis, the Second Circuit concluded that:

> In the case at bar, if plaintiffs are ultimately successful in establishing Nationwide's liability on the disgorgement issue, the district court would then need to determine the separate monetary recoveries to which individual plaintiffs are entitled from the funds disgorged. This process would require the type of non-incidental, individualized proceedings for monetary awards that *Wal-Mart* rejected under Rule 23(b)(2).

*Id*.

With respect to this court's Rule 23(a) analysis, however, the Second Circuit, applying the more rigorous *Wal-Mart* standard, stated "we see no abuse of discretion in the district court's conclusion that the putative class meets Rule 23(a)'s requirements." *Id.* at 29 n.2. Thus, nothing in the Second Circuit's mandate disturbed my prior Rule 23(a) analysis or the findings made thereunder. Nor did the mandate call into question the legal viability of the plaintiffs' proffered

---

increased the rigor of commonality analysis under Rule 23(a)(2), but it did nothing to change how courts determine whether and to what extent those common questions, once identified,

theories of recovery.  On the contrary, the Second Circuit indicated that my threshold determinations on commonality withstood *Wal-Mart*'s increased scrutiny.

Therefore, the scope of remand is quite limited.  The only question is whether the proposed class, having met the Rule 23(a) prerequisites, should be certified under Rule 23(b)(3); that is, whether common questions "predominate" over individual questions and whether class-wide adjudication is "superior" to other modes of adjudication.  *See* Fed. R. Civ. P. 23(b)(3).

Unfortunately, Nationwide grossly misinterprets the mandate as requiring a *de novo* reconsideration of my previous determinations on the legal viability of plaintiffs' theories and other threshold elements under Rule 23(a).  Indeed, Nationwide peppers its brief with citations to *Wal-Mart* in an effort to undermine those very findings and conclusions.  As explained above, however, the Second Circuit has already reviewed my Rule 23(a) analysis in light of *Wal-Mart* and found no abuse of discretion  *See Haddock*, 460 F. App'x at 29 n.2.  And because *Wal-Mart* itself did nothing to change the familiar "predominance" and "superiority" inquiries under Rule 23(b)(3), its holding has little to no bearing on the narrow determinations I am now being asked to make.  *See Jermyn*, 276 F.R.D. at 169.  In other words, *Wal-Mart* may have necessitated remand in this case, but it does not govern the legal analysis upon remand.

## II.  Discussion

In their renewed motion for class certification (doc. # 299), the plaintiffs seek to certify the following class pursuant to Rule 23(b)(3):

> All trustees of all employee pension benefit plans covered by ERISA which had variable annuity contracts with Nationwide or whose participants had individual variable annuity contracts with Nationwide at any time from January 1, 1996, or the first date Nationwide began receiving payments from mutual funds based on a percentage of the assets invested in the funds by Nationwide, whichever came first, to the date of [the class certification order].

---

"predominate" over individualized issues under Rule 23(b)(3).

Nationwide opposes certification, arguing that the plaintiffs cannot satisfy the requirements of Rule 23(b)(3).

A. <u>General Standard for Class Certification</u>

Class certification is appropriate "only if the trial court is satisfied, after a rigorous analysis," that the requirements of Rule 23 have been met. *Wal-Mart*, 131 S. Ct. at 2551 (internal quotation omitted). That "rigorous" analysis proceeds in two steps. First, the district court must "assess whether the proposed class satisfies Rule 23(a)'s four threshold requirements: (1) numerosity ('the class is so numerous that joinder of all members is impracticable'), (2) commonality ('there are questions of law or fact common to the class'), (3) typicality ('the claims or defenses of the representative parties are typical of the claims or defenses of the class'), and (4) adequacy of representation ('the representative parties will fairly and adequately protect the interests of the class')." *In re Am. Int'l Grp., Inc. Sec. Litig.* ("*In re AIG*"), 689 F.3d 229, 238 (2012) (quoting Fed. R. Civ. P. 23(a)).

Second, the district court must determine whether the class action can be maintained under Rule 23(b)(1), (2), or (3). *Id.* The plaintiffs in this case seek to certify a class under Rule 23(b)(3), which permits certification where the court "'finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008) (quoting Fed. R. Civ. P. 23(b)(3)).

"The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). Determining whether the plaintiffs have satisfied

their burden on class certification may entail some overlap with the merits of the underlying

claim, but the Supreme Court has cautioned that "Rule 23 grants courts no license to engage in

free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the

extent—but only to the extent—that they are relevant to determining whether the Rule 23

prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,

133 S. Ct. 1184, 1194-95 (2013); *see also In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24,

41 (2d Cir. 2006).

      B.     <u>Rule 23(a) Requirements</u>

My previous ruling in *Haddock IV* contained detailed findings and conclusions regarding

each of Rule 23(a)'s requirements, *see* 262 F.R.D. at 116-20, which are hereby incorporated by

reference.  Both parties confirmed at oral argument that the Second Circuit's mandate did not

disturb my previous findings with respect to the Rule 23(a) factors.  *See* Mot. Hrg. Tr. at 9-11

(doc. # 505).  Therefore, I need not revisit those factors here.

      C.     <u>Rule 23(b)(3) Requirements</u>

As noted above, to certify a class under Rule 23(b)(3), the plaintiffs "must show that

common questions of law or fact 'predominate' over purely individual questions and that a class

action is 'superior' to other methods of resolving the dispute."  *In re AIG*, 689 F.3d at 239 (citing

Fed. R. Civ. P. 23(b)(3)).   The Rule also instructs that "matters pertinent" to predominance and

superiority include:

> (A) the class members' interests in individually controlling the prosecution or
> defense of separate actions; (B) the extent and nature of any litigation concerning
> the controversy already begun by or against class members; (C) the desirability or
> undesirability of concentrating the litigation of the claims in the particular forum;
> and (D) the likely difficulties in managing a class action.

- 13 -

Fed. R. Civ. P. 23(b)(3). The purpose of these requirements is to ensure that a "class will be certified only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Myers*, 624 F.3d at 547 (internal quotation marks and citation omitted).

Nationwide contests (b)(3) class certification, arguing that (1) individualized questions outnumber common ones; and (2) class-wide resolution of the plaintiffs' claims is not the "superior" method of adjudication. I address each of those requirements in turn.

### 1. Predominance

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). In the Second Circuit, that "requirement is satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *In re AIG*, 689 F.3d at 240 (quoting *Myers*, 624 F.3d at 547). Thus, when "determining whether common issues predominate, courts focus on the liability issue . . . and if the liability issue is common to the class, common questions predominate over individual ones." *Tiro v. Public House Investments, LLC*, 288 F.R.D. 272, 280 (S.D.N.Y. 2012) (internal quotation omitted). "Although a defense may arise and may affect different class members differently, this does not compel a finding that individual issues predominate over common ones. . . . As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of a defense will not

- 14 -

**A14**

automatically foreclose class certification under Rule 23(b)(3)." *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010) (internal quotation and alternation omitted).

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011). Accordingly, my analysis begins with a brief overview of the elements of the plaintiffs' claims.

  a.  Elements of Plaintiffs' Claims

Under ERISA, "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable . . . to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary . . . ." 29 U.S.C. § 1109(a). Thus, to prevail on a claim for breach of fiduciary duty, the plaintiffs must demonstrate that "(1) the defendant was a fiduciary who (2) was acting in a fiduciary capacity, and (3) breached his fiduciary duty." *In re Bank of America Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 756 F. Supp. 2d 330, 350 (S.D.N.Y. 2010). I address each of those elements below.

With respect to the first element, ERISA provides, in relevant part, that "a person is a fiduciary with respect to a plan to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . ." 29 U.S.C. § 1002(21)(A). Courts construe the term "fiduciary" broadly, *see Blatt v. Marshall & Lassman*, 812 F.2d 810, 812 (2d Cir. 1987), taking a functional approach to determining fiduciary status, *see Mertens v. Hewitt Assoc.*, 508 U.S. 248, 262 (1993) ("ERISA . . . defines "fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan.") (emphasis in

original).  Under that functional approach, "a person may be an ERISA fiduciary with respect to certain matters but not others, for he has that status only 'to the extent' that he has or exercises the described authority or responsibility."  *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1259 (2d Cir. 1987*); see also Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 28 (2d Cir. 2002) (quoting same).

Because an ERISA fiduciary "may wear different hats," *Pegram v. Herdrich*, 530 U.S. 211, 225 (2000), functioning as a fiduciary for some purposes but not others, courts have held that ERISA's rules and prohibitions "apply only to decisions by an [entity] acting in its fiduciary capacity."  *Flanigan v. General Elec. Co.*, 242 F.3d 78, 87 (2d Cir. 2001).  Thus, the second element requires that plaintiffs demonstrate not only that the defendant qualifies for fiduciary status, but that the actions or transactions complained of were undertaken in the defendant's capacity as a fiduciary to the plan.  *See id.* at 87-88.

Lastly, with respect to the third element, ERISA imposes "a number of detailed duties and responsibilities" on those who are—or who function as—fiduciaries, the breach of which gives rise to personal liability under the statute.  *Mertens*, 508 U.S. at 251.  As relevant here, an ERISA fiduciary has (1) a duty of loyalty, which requires that he "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A); and (2) a duty of prudence, which requires that the fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," 29 U.S.C. § 1104(a)(1)(B).  Moreover, the statute imposes certain transaction rules prohibiting fiduciaries from, *inter alia*, "deal[ing] with the assets of the plan in his own interest or for his own account," 29 U.S.C. § 1106(b)(1), or "receiv[ing] any

consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan," 29 U.S.C. § 1106(b)(3).

In the case at bar, the plaintiffs rely on two different theories to explain how Nationwide functioned as a fiduciary: (1) the specific accumulation theory; and (2) the mutual fund selection theory. Under the specific accumulation theory, the plaintiffs contend that Nationwide acted as a fiduciary because its variable annuity contracts gave it custody and/or control over a large pool of retirement contributions, which Nationwide used, in turn, to obtain revenue sharing payments from mutual funds seeking access to that pool of money. In other words, Nationwide "leverage[ed] its position as sole gatekeeper to those funds to extract the revenue sharing payments from the mutual funds in exchange for giving the mutual funds the opportunity to be investment choices for the Plans and the participants." *Haddock IV*, 262 F.R.D. at 107. In addition, under the mutual fund selection theory, the plaintiffs argue that Nationwide exercised the requisite authority or control over the accumulation units by retaining the ability to select, remove and replace the mutual funds that would be offered as investment options for the Plans and their participants. *Id.* at 107-08. Based on one or both of those fiduciary theories, the plaintiffs claim that Nationwide's acceptance of revenue sharing payments from the mutual funds it made available to the Plans and participants breached its duties of loyalty and prudence under sections 1104(a)(1)(A)-(B), and violated ERISA's prohibited transaction rules under sections 1106(b)(1) and (3).

As explained more fully below, having considered the underlying elements of the plaintiffs' claims, as well as my prior determinations on the sources of class-wide proof supporting those claims, I conclude that the common legal and factual questions I previously identified in *Haddock IV* are far more substantial than any individualized issues that may arise at

- 17 -

**A17**

trial.  I divide my analysis into two parts: (1) the plaintiffs' liability case; and (2) the plaintiffs' claims for monetary relief.

                    b.       Liability

With respect to liability, the two core determinations that must be made at trial—namely, (1) whether Nationwide functioned as an ERISA fiduciary with respect to the Plans, and (2) whether Nationwide's conduct in collecting revenue sharing payments violated its fiduciary obligations—both hinge on the ERISA consequences of Nationwide's basic investment process, a process that was relatively uniform across the proposed class.  As I stated in *Haddock IV*, "whether Nationwide is a fiduciary and whether it breached its obligations to the Plans as a fiduciary can be resolved on the basis of the characteristics of Nationwide's contractual relationship with the plans that are common to the Class.  Furthermore, any breach of Nationwide's fiduciary obligations will be determined on the basis of conduct that is applicable to the whole Class."  262 F.R.D. at 128.  Thus, because the plaintiffs' "legal and factual theories are premised on the structural nature of Nationwide's contractual relationship with the Plans, which is identical across the Class," *id.* at 125, the plaintiffs' liability case is particularly well suited for class-wide adjudication.

Moreover, I previously determined that the plaintiffs satisfied the "typicality" requirement under Rule 23(a)(3) because "all of the Trustees' claims arise from the same practice or course of conduct that gives rise to the claims of proposed Class members—namely, that Nationwide accepted revenue sharing payments from those mutual funds that it offered as investment options to annuity contract-holders in violation of its fiduciary duties to the Plans . . . ."  *Id.* at 117.  That determination, which the Second Circuit has reviewed and implicitly sustained, bolsters the view that common issues predominate in the plaintiffs' liability case.  *See*

*Stinson v. City of New York*, 282 F.R.D. 360, 382 (S.D.N.Y. 2012) ("Although predominance is a more stringent inquiry, 'satisfaction of the typicality requirement of Rule 23(a) . . . goes a long way toward satisfying the Rule 23(b)(3) requirement of commonality.'") (quoting *Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 598 (2d Cir. 1986)).

Nationwide's arguments to the contrary—nearly all of which were raised and rejected in my previous rulings in *Haddock I* and *Haddock IV*—are (yet again) unpersuasive.

First, Nationwide recycles a number of arguments to demonstrate why the plaintiffs cannot prove principally through common evidence that Nationwide functioned as a fiduciary when it collected revenue sharing payments from the select group of mutual funds it offered as investment options. *See* Def.'s Opp'n to Pl.'s Renewed Mot. for Class Certification at 5-15 (doc. # 473). Those arguments follow a similar refrain. According to Nationwide, even though the plaintiffs' theories of liability purport to be based on generalized company policies and practices applicable to the class as a whole, those theories fail as a matter of law[5] and, as a result, the plaintiffs will have to rely on *different* theories to prove their case—theories that, unsurprisingly, depend on thousands of individualized inquiries that are inappropriate for class-wide adjudication.

On more than one occasion, however, I have ruled that the fiduciary theories relied upon by the plaintiffs—namely, the specific accumulation theory and the mutual fund selection theory—are viable under ERISA's functional approach. *See Haddock I*, 419 F. Supp. 2d at 164-

---

[5] Indeed, Nationwide has been absolutely adamant throughout this litigation that the plaintiffs' fiduciary claims cannot succeed under prevailing ERISA law. It is somewhat curious, therefore, that Nationwide has opposed class certification of those claims with such vigor. If Nationwide is so certain that the plaintiffs' fiduciary claims will fail on the merits under ERISA, it should welcome class certification so that any and all such claims—involving thousands of potential plaintiffs—can be resolved in its favor in a single proceeding. Filing reams of paper to oppose class certification suggests that, perhaps, Nationwide doth protest too much.

66; *Haddock IV*, 262 F.R.D. at 122-25.  And as I stated before, "[u]nder neither of those theories is Nationwide's fiduciary status only determinable on a micro level by examining the nature and circumstance of each Class plan's annuity contract and the timing of when the contract was signed relative to Nationwide's agreement with a particular mutual fund."  *Haddock IV*, 262 F.R.D. at 123-24.  Thus, although Nationwide strives mightily to limit its eligibility for fiduciary status to the narrow window of time in which it negotiated the revenue sharing payments with particular mutual funds, I have already determined that the plaintiffs' fiduciary theories extend much further, capturing other aspects of Nationwide's alleged relationship with the proposed plaintiff class.  *See id.* at 124-25.[6]

---

[6] In *Haddock IV*, I compared the plaintiffs' breach of fiduciary duty theories to a hypothetical attorney who places money from client trust accounts with a particular bank based not on prevailing interest rates, but on certain personal kickbacks the bank offered him to keep client money on the books.  *See Haddock IV*, 262 F.R.D. at 124-25.  Nationwide takes issue with that hypothetical, arguing that it "highlighted the presumptions built into Plaintiffs' theories" because unlike a lawyer, whose fiduciary obligations are inherent to the attorney-client relationship, Nationwide is an "arms-length provider of annuity products to the marketplace."  Def.'s Opp'n to Pls.' Renewed Mot. for Class Certification at 26 (doc. # 473).

To be clear, that hypothetical was never meant to liken Nationwide to an attorney; rather, it was meant to rebut Nationwide's excessively narrow view of how and when fiduciary status is determined.  But, in any event, the analogy is not rendered inapt merely because Nationwide is an "arms-length provider" in a free market.  Attorneys, too, offer their services in the open market where consumers are free to pick and choose whom to retain (and whom to trust).  What matters, for present purposes, is that my hypothetical attorney's fiduciary status was not restricted to the moment in time when he first placed his clients' money with the bank in exchange for kickbacks, nor were his fiduciary obligations limited to those clients whose funds were in the account at the time negotiated the deal.  Rather, the attorney's fiduciary obligations extended to all clients whose funds he controlled throughout the duration of his dealings with the bank.  *See Haddock IV*, 262 F.R.D. at 125.  The point, which the defendant appears to miss, is that Nationwide's fiduciary status similarly "extends further than it admits."  *Id.* at 125.  Nationwide's eligibility for fiduciary status is not limited to the moment in time in which it negotiated the revenue sharing payments with particular mutual funds, but rather extends to its alleged exercise of authority or control over the "menu" of mutual funds in which plan assets were invested over time.

- 20 -

Second, Nationwide argues that, even if the plaintiffs can demonstrate fiduciary status based on general company polices without resort to micro-level analysis of individual annuity contracts, *Wal-Mart* now precludes such "general practice" theories. The theories at issue in *Wal-Mart*, however, bear little resemblance to those asserted here. *Wal-Mart* involved a proposed class of 1.5 million female employees alleging sex discrimination in violation of Title VII. There, the plaintiffs' theories of liability were based not on any "express corporate policy against the advancement of women," 131 S. Ct. at 2548, or "uniform employment practice," *id.* at 2554, but rather on Wal-Mart's policy of allowing local managers to exercise discretion over their employees' pay and promotion. According to the plaintiffs, that discretion, when combined with a "corporate culture" of sexual stereotyping, created a disparate impact on women in the workplace. *Id.* But what was lacking was evidence of a common thread tying the putative class members' claims together. Because the plaintiffs failed to present any "significant proof" of a "general policy" of discrimination that affected class members in the same way, *see id.* at 2254, the Supreme Court ultimately rejected the class for lack of "commonality" under Rule 23(a)(2).

Here, in contrast, the "general policy" at the heart of the plaintiffs' case—namely, Nationwide's uniform investment process—is evidenced by the standardized terms contained in the annuity contracts that governed Nationwide's relationship with the Plans and participants. That, in my view, is "significant," if not ample, proof sufficient to satisfy *Wal-Mart*. Moreover, the Second Circuit has already reviewed the plaintiffs' theories of liability in light of *Wal-Mart* and concluded that those theories are viable, at least for Rule 23(a) purposes. *See Haddock*, 460 F. App'x at 29 n.2. Thus, to the extent *Wal-Mart*'s increased rigor under Rule 23(a)(2) has any bearing on the determinations I am now being asked to make under Rule 23(b)(3), the Second

- 21 -

**A21**

Circuit's mandate makes clear that the plaintiffs' liability case survives that heightened scrutiny. Nationwide's reliance on *Wal-Mart* to oppose class certification is, therefore, unavailing.

In any event, even putting the above analysis aside, nothing in the Second Circuit's mandate or the Supreme Court's decision in *Wal-Mart* prohibits me from certifying separately a (b)(2) injunctive (i.e., liability) class and a (b)(3) damages (i.e., disgorgement) class under the traditional authority conferred by Federal Rule of Civil Procedure 23(c)(4). *See Maziarz v. Hous. Auth. of the Town of Vernon*, 281 F.R.D. 71, 83 (D. Conn. 2012) ("[I]t is consistent with *Wal-Mart* for the court, in an appropriate situation, to certify an 'injunction class' under Rule 23(b)(2) and a 'damages class' under Rule 23(b)(3)."); *United States v. City of New York*, 276 F.R.D. 22, 27-32 (E.D.N.Y. 2011) (holding that *Wal-Mart* did not disturb the district court's ability under Rule 23(c)(4) to certify only those portions of a claim that satisfy Rule 23(b)(2), even if other portions of the claim do not).  Thus, even if the plaintiffs' liability case was somehow inappropriate for (b)(3) class treatment, nothing prevents me from bifurcating this case and proceeding with the liability phase based on the same (b)(2) injunctive class I previously certified in *Haddock IV*, while reserving for later stages, if necessary, a decision on whether to certify separately a (b)(3) damages class to determine the amount of disgorged profits to which individual members of the plaintiff class are entitled.  *See, e.g.*, *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 371-72 (7th Cir. 2012) (endorsing the method of "divided certification," whereby the court conducts "a (b)(2) proceeding first, and if the plaintiffs obtain declaratory relief a (b)(3) proceeding (where notice and the right to opt out are mandatory) to follow").

In sum, I conclude that common questions predominate the plaintiffs' claims for breach of fiduciary duty under ERISA, making the liability case appropriate for class-wide adjudication

under Rule 23(b)(3).  Alternatively, I also conclude that the injunctive class I previously certified

under Rule 23(b)(2) remains a viable means of adjudicating the plaintiffs' liability case, so long

as any individual claims for monetary relief are determined in a separate proceeding—either by

way of a subsequently-certified (b)(3) damages class or through individual damages trials—after

the liability phase has concluded.

c. Monetary Relief

The plaintiffs' claims for monetary relief (i.e., disgorgement of ill-gotten profits) pose

different challenges under Rule 23(b)(3).  On this front, Nationwide argues that individualized

issues relating to certain defenses preclude certification, including (1) whether the Plans ratified

Nationwide's receipt of revenue sharing payments; (2) whether the payments were made in

consideration for services rendered by Nationwide; and (3) whether the Nationwide actually

retained any "profits" from those payments.  *See* Def.'s Opp'n to Pls.' Renewed Mot. for Class

Certification at 29-34 (doc. # 473).

I have already determined, however, that "a reasonable fact-finder could conclude that

the *entire value* of the revenue sharing payments is 'profit' eligible to be disgorged for

Nationwide's violation of its ERISA fiduciary obligations," so that "no individual inquiry into an

offset for the reasonable value of the services performed would be necessary."  *Haddock IV*, 262

F.R.D. at 129 (emphasis added); *see also id.* (relying on a report by the plaintiffs' expert, Stanley

Monsowitz, to conclude that, because "Nationwide was already being compensated" for

administrative tasks related to the mutual funds, "the revenue sharing payments were pure

profit").  If that is the case, then calculating the amount of disgorged profits attributable to

individual plans "would not be difficult because Nationwide has kept very clear records

regarding the amount of revenue sharing payments it has collected."  *Id.* at 128.  In other words,

- 23 -

**A23**

"if the value of the disgorgement award is the value of the revenue sharing payments themselves, determining the appropriate figure for each Class member requires a mechanical calculation using readily available data." *Id.* at 129.

Moreover, even if individualized damages issues do arise at trial, "there are a number of management tools available" to address them, "such as bifurcation, the use of a magistrate or special master, alteration of the class definition, the creation of subclasses, or even decertification after a finding of liability." *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 231 (2d Cir. 2006) (quotation marks and alteration omitted). Given the substantial efficiencies generated by assessing liability on a class-wide basis, I am not at all persuaded that Rule 23(b)(3) precludes certification merely because some individualized assessments may be necessary on the issue of monetary relief. *See, e.g.*, *Brown*, 609 F.3d at 484 ("Rule 23(b)(3) requires that common questions predominate, not that the action include only common questions.").

To summarize, based on the detailed findings I made in *Haddock IV*—findings the Second Circuit reviewed and found no reason to disturb—I conclude that the plaintiffs have satisfied the predominance requirement of Rule 23(b)(3).

## 2. *Superiority*

Rule 23(b)(3)'s superiority prong requires that class-wide adjudication be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In making this determination, the court must balance, "in terms of fairness and efficiency, the advantages of a class action against those of alternative available methods of adjudication." *Anwar v. Fairfield Greenwich Ltd.*, 289 F.R.D. 105, 114 (S.D.N.Y. 2013). And although "pertinent" to both the predominance and superiority inquiries, *see In re AIG*, 689 F.3d

at 240, the four pragmatic factors listed under Rule 23(b)(3) are particularly helpful in this

regard.  Those factors include:

> (A) the class members' interests in individually controlling the prosecution or
> defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already
> begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in
> the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Nationwide does not seriously contest the first three factors—and for good reason.  All of

those factors either weigh in favor of certification or are neutral factors.  First, even with the

availability of attorneys' fees, there is no evidence that individual class members would prefer to

control the prosecution of their claims through separate lawsuits.  Second, I am unaware of any

litigation concerning these specific claims that is already in progress.  Lastly, there is nothing to

suggest that concentrating the litigation in this forum is undesirable; jurisdiction and venue are

appropriate in this district, and plaintiffs have already spent over a decade prosecuting this action

here.  Thus, I conclude that, on balance, the first three factors support (b)(3) certification.

Nationwide's primary challenge to superiority is focused on the last factor:

manageability.  Manageability, however, "is an issue peculiarly within a district court's

discretion," *Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010), and courts rarely, if

ever, deny class certification solely on manageability grounds, particularly where, as here, the

case will be tried to the court, rather than to a jury.  In any event, Nationwide's arguments

against manageability rely, almost entirely, on a premise I have already rejected—namely, that

innumerable individualized inquires will swallow common ones.  Thus, for substantially the same reasons articulated above, manageability poses no impediment to (b)(3) certification.

In my view, class-wide adjudication of the plaintiffs' claims serves the core pragmatic objectives of Rule 23, including the "efficient resolution of the claims or liabilities of many individuals in a single action, as well as the elimination of repetitious litigation and possibly inconsistent adjudications."  *Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 479 (E.D.N.Y. 2001) (citation omitted).  Accordingly, I conclude that the plaintiffs have satisfied Rule 23(b)(3)'s superiority requirement.

## III.    Conclusion

In sum, the plaintiffs' renewed motion for class certification (doc. # 299) is GRANTED. The claims asserted in the Sixth Amended Complaint shall proceed on a class-action basis under Federal Rule of Civil Procedure 23(b)(3).  A separate order of class certification shall issue forthwith.  That order will require the plaintiffs to submit a proposed notice to class members, and all other necessary documents, within forty-five (45) days.

It is so ordered.

Dated at Bridgeport, Connecticut, this 6th day of September 2013.

 /s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LOU HADDOCK, as trustee of the Flyte
Tool & Dye Company Inc. 401(k) Profit-
Sharing Plan, et al.,
      Plaintiffs,

      v.

NATIONWIDE FINANCIAL SERVICES,
INC. and NATIONWIDE LIFE
INSURANCE COMPANY,
      Defendants.

CIVIL ACTION NO.
3:01cv1552 (SRU)

## <u>ORDER OF CLASS CERTIFICATION</u>

For the reasons set forth in the Ruling on Plaintiffs' Renewed Motion for Class

Certification, dated September 6, 2013, it is hereby ORDERED, with respect to the claims

against defendants Nationwide Financial Services, Inc. and Nationwide Life Insurance Company

(collectively, "Nationwide"), that:

1. The plaintiffs' renewed motion for class certification (doc. # 299) is GRANTED;

2. The following plaintiff class (the "Class") is hereby certified pursuant to Rules 23(a)

and 23(b)(3) of the Federal Rules of Civil Procedure:

> All trustees of all employee pension benefit plans covered by ERISA which had
> variable annuity contracts with Nationwide or whose participants had individual
> variable annuity contracts with Nationwide at any time from January 1, 1996, or
> the first date Nationwide began receiving payments from mutual funds based on
> a percentage of the assets invested in the funds by Nationwide, whichever came
> first, to the date of September 6, 2013;

3. The Class is so numerous that joinder of all members is impracticable; there are

questions of law and fact common to the Class that predominate over individual questions; the

claims of the representative plaintiffs are typical of the claims of the members of the Class; the

**A27**

representatives will fairly and adequately protect the interests of the Class; and a class action is

superior to all other available methods for the fair and efficient adjudication of this controversy;

    4. The Class is certified for resolution of all claims in the plaintiffs' Sixth Amended

Complaint filed on November 17, 2009, and all defenses asserted in Nationwide's Answer

thereto, including the following factual and legal issues:

    a.    Whether Nationwide constitutes a fiduciary pursuant to the specific accumulation unit theory;

    b.    Whether Nationwide constitutes a fiduciary pursuant to the mutual fund selection theory;

    c.    Whether Nationwide, in arranging for, receiving and retaining the revenue sharing payments, discharged its duties with respect to the Plans solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries or defraying reasonable expenses of administering the Plans (i.e., whether Nationwide violated ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A));

    d.    Whether Nationwide, in arranging for, receiving and retaining the revenue sharing payments, discharged its duties with respect to the Plans solely in the interest of the participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims (i.e., whether Nationwide violated ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B));

    e.    Whether Nationwide dealt with the assets of the Plans (accumulation units and the underlying mutual fund shares in the case of group annuity contracts) in its own interest or for its own account (i.e., whether Nationwide violated ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1));

    f.    Whether Nationwide received any consideration (the revenue sharing payments) for its personal account from any parties (mutual fund families) dealing with the Plans in connection with transactions (the revenue sharing contracts) involving the assets of the Plans (the accumulation units and the underlying mutual fund shares in the case of the group annuity contracts) (i.e., whether Nationwide violated ERISA § 406(b)(3), 29 U.S.C. §

-2-

**A28**

1106(b)(3));

g.     Whether any part of the revenue sharing payments constitutes payments by the mutual fund families to Nationwide for services rendered by Nationwide to the mutual fund families;

h.     Whether Nationwide passed on any part of the revenue sharing payments to the Plans;

i.     Whether the Class is entitled to an injunction requiring Nationwide to disgorge all revenue sharing in the future pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3); and

j.     Whether the Class is entitled to disgorgement/restitution of all past revenue sharing pursuant to ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2);

5.  Pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, the Court hereby designates the following as Class Counsel: Antonio Ponvert, III, Neal A. DeYoung, Richard A. Bieder, and William M. Bloss of Koskoff, Koskoff, & Bieder, P.C.; Gregory G. Jones; Marc R. Stanley, Martin Woodward, and Roger L. Mandel of Stanley, Mandel & Iola; and

6.  Within forty-five (45) days of this Order, the parties will submit for the Court's approval a class notice program and forms of notice, pursuant to Fed. R. Civ. P. 23(c)(2)(B), that are agreeable to counsel for all parties in this action.

It is so ordered.

Dated at Bridgeport, Connecticut, this 6th day of September 2013.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge

-3-

A29

**29 U.S.C. § 1002(21) [ERISA § 3(21)]**

(A) Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of this title.

(B) If any money or other property of an employee benefit plan is invested in securities issued by an investment company registered under the Investment Company Act of 1940 [15 U.S.C.A. § 80a-1 et seq.], such investment shall not by itself cause such investment company or such investment company's investment adviser or principal underwriter to be deemed to be a fiduciary or a party in interest as those terms are defined in this subchapter, except insofar as such investment company or its investment adviser or principal underwriter acts in connection with an employee benefit plan covering employees of the investment company, the investment adviser, or its principal underwriter. Nothing contained in this subparagraph shall limit the duties imposed on such investment company, investment adviser, or principal underwriter by any other law.

**29 U.S.C. § 1104(a) [ERISA § 404(a)], Fiduciary Duties**

(a) Prudent man standard of care

(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

(2) In the case of an eligible individual account plan (as defined in section 1107(d)(3) of this title), the diversification requirement of paragraph (1)(C) and the prudence requirement (only to the extent that it requires diversification) of paragraph (1)(B) is not violated by acquisition or holding of qualifying employer real property or qualifying employer securities (as defined in section 1107(d)(4) and (5) of this title).

## 29 U.S.C. § 1106(b) [ERISA § 406(b)], Prohibited Transactions

(b) Transactions between plan and fiduciary

A fiduciary with respect to a plan shall not—

> (1) deal with the assets of the plan in his own interest or for his own account,

> (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

> (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

## 29 U.S.C. § 1109 [ERISA § 409], Liability for breach of fiduciary duty

(a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.  A fiduciary may also be removed for a violation of section 1111 of this title.

(b) No fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary.